NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

_____
                                            :

NEW JERSEY PHYSICIANS UNITED       :
RECIPROCAL EXCHANGE,               :
                                              :
                     Plaintiff,     :      Civ. Action No. 18-04110-BRM-TJB
                                              :
           v.                          :              **OPINION**
                                              :
ARTHUR J. GALLAGHER & CO. and      :
WILLIAM CAREY                  :
                                              :
                    Defendants.    :
_____:

**MARTINOTTI, DISTRICT JUDGE**

      Before this Court is Plaintiff New Jersey Physicians United Reciprocal Exchange's ("NJ PURE") Motion for a Preliminary Injunction. (ECF No. 14.) Defendants Arthur J. Gallagher & Co. ("AJG") and William Carey (collectively, "Defendants") oppose the Motion. (ECF No. 16.) Pursuant to Federal Rule of Civil Procedure 78(a), the Court heard oral argument on June 19, 2018. For the reasons set forth herein, NJ PURE's Motion for a Preliminary Injunction is **DENIED**.

**I.**      **BACKGROUND**

      **A.**      **The Parties**

      This matter arises from NJ PURE'S allegation that Defendants are spreading false and misleading information to the public and to NJ PURE's actual and prospective customers and insureds, regarding NJ PURE's business, products, and services. (Compl. (ECF No. 1) ¶¶ 15-20.) NJ PURE is a New Jersey not-for-profit reciprocal insurance exchange that sells medical malpractice insurance directly to medical providers, organized under N.J.S.A. § 17:50-1, *et seq.*

(ECF No. 1 ¶ 5; ECF No. 14-1 at 3; ECF No. 16 at 2.) AJG is a global insurance brokerage and risk management services firm that sells competing medical malpractice insurance products on behalf of other insurance carries. (ECF No. 14-1 at 3 and ECF No. 16 at 2.) Carey is the Managing Director of AJG's Healthcare Practice and is responsible for medical professional liability insurance sales. (ECF No. 16 at 2.) No one disputes NJ PURE and AJG are direct competitors in the medical malpractice insurance marketplace. (ECF No. 14-1 at 3 and ECF No. 16 at 2.)

**B.**     **September 13, 2017 Email from AJG to Empire Medical Associates, P.C.**

In 2017, AJG representatives worked to try "to retain the medical professional liability insurance business of [its] client Empire Medical Associates, P.C. ('Empire')." (ECF No. 16-2 ¶ 4.) During the course of its discussion with Empire, Empire disclosed its consideration of NJ PURE, which led to "a discussion about the relative financial strength of NJ PURE and other medical professional liability insurance carriers." (*Id.*) These discussions were later followed by an email sent by AJG on September 13, 2017, which attached a "'five[-]year financial summary for NJ PURE' and reported that '2016 was another bad year with a very high expense ratio of 43.1% of premiums and a combined loss and expense ratio of 130.8%.'" (ECF No. 1 ¶ 37.) The email also stated, "NJ PURE is one of the worst performing companies among its peers." (*Id.* ¶ 37.)

The facts and figures referenced in the September 13, 2017 email were taken directly from the "Five-Year Historical Data" report prepared by the National Association of Insurance Commissioners ("NAIC") for NJ PURE and from a 2017 report published by Conning Research and Consulting, Inc. ("Conning"). (ECF No. 16-2 ¶ 6.) "The NAIC is the standard-setting and regulatory support organization within the United States, which was created and is governed by the chief insurance regulators from each of the fifty states, the District of Columbia, and five U.S.

territories." (*Id.* ¶ 7.) Conning has been providing research and analysis to the insurance industry for over fifty years. (*Id.* ¶ 8.) The documents relied upon in the September 13, 2017 email are all publicly available. (*Id.* ¶ 9.)

NJ PURE contends "AJG intentionally and knowingly omitted the context and facts necessary to understand how an expense ratio applies to a reciprocal exchange, and instead uses that figure to intentionally create a false impression in the mind of a customer." (ECF No. 1 ¶ 39.)

On December 21, 2017, when the September 13, 2017 email came to NJ PURE's attention, NJ PURE sent a "Notice to Cease and Desist" to AJG. (ECF No. 14-2 ¶ 8.) The notice served to provide specific explanations why the representations made by AJG were false. (ECF No. 14-2, Ex. B.) AJG did not respond to the notice. (ECF No. 14-2 ¶ 8.)

### C. Carey's March 10, 2018 Presentation to the New Jersey Chapter of the American College of Surgeons

On March 10, 2018, Carey was invited to speak at the New Jersey Chapter of the American College of Surgeons meeting to address medical malpractices issues to an audience consisting of twenty-five to thirty surgeons, some of which were potential and actual customers of NJ PURE. (ECF No. 1 ¶¶ 21-23.) NJ PURE alleges that during Carey's PowerPoint presentation, he presented a slide illustrating the recent insolvencies of two medical malpractice insurance companies, and the consequences the insolvencies had on those companies' insureds. (*Id.* ¶ 25.) Carey also presented a slide allegedly illustrating a five-year financial analysis (the same five-year historical date referenced above) and historical overview of NJ PURE, explaining that NJ PURE was the perfect example of a medical malpractice insurance provider with poor finances that should be of concern to physicians and insureds. (*Id.* ¶¶ 26-27.) These facts are in dispute. Defendants allege Carey's presentation did not identify NJ PURE by name. Instead,

> [t]he last substantive slide of Carey's presentation, entitled 'Industry Indicators,' included a chart containing five-year (2012-2016) historical financial data as reported to the NAIC by an <u>unnamed insurance company</u>. . . . Although the date in the slide pertained to NJ PURE, Carey <u>did not identify NJ PURE as being the carrier whose data was presented</u>.

(ECF No. 16 at 6.) Defendants allege NJ PURE's own representative, who was present during Carey's presentation, identified the numbers on the slide as being NJ PURE's numbers. (*Id.* at 6-7.)

### D.     Carey's March 29, 2018 E-mail to Lawrence OB/GYN

On March 29, 2018, after NJ PURE filed this Complaint, Carey sent an email to Lawrence OB/GYN, a medical group insured by NJ PURE, encouraging it to read a Superior Court of New Jersey Order for Judgment involving NJ PURE. (ECF No. 14-1 at 7-8.) The email stated:

> I must implore you to read the attached. NJ PURE has been hit with a 4.8 million "BAD FAITH" verdict, in addition to a 1 million dollar settlement on the same case. This, in my opinion, may be fatal. I have attached the updated financials that I shared with you last year, things continue to decline.
>
> Bottom line is their Surplus is 12 million, they just lost 4.8 million of it, based on the attached. I have highlighted the key points for you.
>
> This is a very serious situation, I would strongly urge you to contemplate moving from them, NOW.

(ECF No. 14-2, Ex. C (citing *DiPaolo, et al. v. New Jersey Physicians United Reciprocal Exchange*, ESX-L-1580-13).) However, no $4.8 million statement "bad faith" verdict or judgment has been entered against NJ PURE. Instead, a liability judgment was entered and a proposed order of judgment for $4.8 million was submitted by one of the parties in that pending litigation but was rejected by the trial court. (ECF No. 14-1 at 8.) At Oral Argument, NJ PURE noted the liability judgment was reconsidered and vacated. Defendants admit they "mistakenly stated that the court

had entered a $4.8 million verdict in the case." (ECF No. 16 at 7.) Carey now recognizes "he misunderstood the developments in the *DiPaolo* proceeding, and that although summary judgment on liability was entered against NJ PURE on Dr. DiPaolo's bad-faith claim, the Court had not yet entered a money judgment against NJ PURE." (*Id.* at 7-8.) Defendants further "certified" they "[would] take care to make that distinction clear should [they] have any future discussion about the *DiPaolo* case." (*Id.* at 7-8.)

NJ PURE claims the false statements contained in the March 29 email caused Lawrence OB/GYN concern, and that Lawrence OB/GYN "reached out to at least one other medical provider insured by NJ PURE to discuss their contents." (ECF No. 14-1 at 10.) NJ PURE alleges many of its insureds reached out to NJ PURE concerned and inquiring about their financial difficulties and the $4.8 million verdict after being contacted by AJG or one of its representatives. (*Id.* at 10-13.)

### D. Procedural History

On March 23, 2018, NJ PURE filed a Complaint against Defendants alleging violations of the Lanham Act, 15 U.S.C. § 1125(a), as well as New Jersey trade libel, defamation, and tortious interference with prospective economic advantage. (ECF No. 1.) On April 27, 2018, NJ PURE filed a Motion for Preliminary Injunction requesting "to stop Defendants from further making and disseminating false and derogatory information about NJ PURE pending the determination of NJ PURE's Lanham Act, defamation, unfair competition, and other claims." (ECF No. 14-1 at 3.) Defendants oppose the Motion. (ECF No. 16.) The Motion was fully briefed on May 14, 2018, and the Court heard oral argument on June 19, 2018.

## II. LEGAL STANDARD

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). "A plaintiff seeking a preliminary injunction must establish that he is [1] likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Ferring*, 765 F.3d at 210 (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). The movant bears the burden of showing these four factors weigh in favor of granting the injunction, and a failure to establish any one factor will render a preliminary injunction inappropriate. *Id.* A likelihood of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179) (3d Cir. 2017). "How strong a claim on the merits is enough depends on the balance of the harms: the more net harm the injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* (quoting *Hoosier Energy Rural Elec. Co-op, Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). The moving party must show irreparable harm is more likely than not in the absence of an injunction. *Id.*

## III. DECISION

NJ PURE seeks "a preliminary injunction to stop Defendants from further making and disseminating false and derogatory information about NJ PURE pending the determination of NJ PURE's Lanham Act, defamation, unfair competition, and other claims." (ECF No. 14-1 at 3.)

### A.  The Likelihood NJ PURE Will Suffer Irreparable Harm

The Court finds NJ PURE has failed to establish irreparable harm. Because the failure to establish any one factor will render a preliminary injunction inappropriate, the Court will begin with the irreparable harm factor and will not analyze the remaining factors. *Ferring*, 765 F.3d at 210.

NJ PURE argues it will suffer irreparable harm if the requested injunction is not granted because Defendants false and misleading statements have led to reputational harm and loss of goodwill. (*Id.* at 27-28.) Specifically, NJ PURE argues Lawrence OB/GYN has reached out to other medical providers to discuss the *DiPaolo* case, other insureds or potential prospects have reached out to NJ PURE with concerns about its financial abilities, and that a doctor decided not to pursue business with NJ PURE. (*Id.* at 28-29.) Defendants contend, however, NJ PURE's evidence of irreparable harm falls short because "none of the individuals identified are said . . . to have represented that the offending statements caused, or would lead to, the discontinuance of an existing business relationship with NJ PURE or serve as a bar to doing business with NJ PURE in the future." (ECF No. 16 at 13.) Defendants also state:

> NJ PURE does not present evidence demonstrating that, in the absence of the requested injunctive relief, AJG and Carey will continue to disseminate false statements that are likely to cause irreparable injury. To the contrary, in his declaration Carey admitted that he misunderstood developments in the *DiPaolo* bad-faith case . . . . Carey further certified that, now that he understand that distinction, he would make it clear if he has any further discussions about the case.

(*Id.* at 14-15.)

A party seeking an injunction must make "a clear showing of immediate irreparable injury." *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (1980). The Third Circuit has clarified the standard for irreparable harm in Lanham Act cases in *Ferring*. There, the Third

Circuit held that "a party seeking a preliminary injunction in a Lanham Act case is not entitled to a presumption of irreparable harm but rather is required to demonstrate that she is likely to suffer irreparable harm if an injunction is not granted." *Ferring*, 765 F.3d at 217.

"Irreparable harm 'must be of a peculiar nature, so that compensation in money alone cannot atone for it.'" *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (quoting *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987)). The Third Circuit has stated that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992). "The Supreme Court has defined goodwill as 'the expectancy of continued patronage.'" *Graco, Inc. v. PMC Glob., Inc.*, No. 08-1304, 2009 WL 904010, at *15 (D.N.J. Mar. 31, 2009) (quoting *Newark v. Morning Ledger Co. v. United States*, 507 U.S. 546, 555 (1993)).

Here, the facts do not support a finding of an immediate, on-going, continuous, or imminent risk of irreparable harm. Instead, this Motion relies upon three isolated events NJ PURE alleges harmed and will continue to harm its reputation. The first isolated event occurred in September 2017, six months prior to NJ PURE filing this action, six months before the second isolated event occurred on March 10, 2018, and seven months prior to NJ PURE filing this Motion. This event involved an email from AJG to Empire, where AJG attempted to retain Empire's business by providing them a five-year financial summary of NJ PURE. However, NJ PURE fails to allege actual harm occurred from this event. Indeed, the record demonstrates that after this communication, Empire moved its medical professional liability insurance to NJ PURE. (ECF No. 16-2 ¶ 12.)

The second isolated event occurred on March 10, 2018, during a panel discussion at the New Jersey Chapter of the American College of Surgeons. As demonstrated in the briefs,

declarations, and at Oral Argument, the facts of this event are in dispute. A preliminary injunction cannot be issued where material issues of fact are in dispute. *Vita-Pure, Inc. v. Bhatia*, 2015 WL 1496396, at * 3 (D.N.J. Apr. 1, 2015 (denying injunction where factual disputes "preclude a determination that Plaintiffs have established a likelihood of success on the merits"). Nevertheless, despite the factual dispute, it remains that NJ PURE has failed to demonstrate actual harm occurred from that panel discussion, including loss of good will. Instead, NJ PURE merely alleges the presentation was a misrepresentation of NJ PURE's financial situation. The mere fact that Defendants allegedly defamed or misrepresented facts about NJ PURE in the presence of twenty-five to thirty physicians, even if some were its insureds, is not enough. NJ PURE points to no "loss of control of reputation, loss of trade, and loss of goodwill." *S&R Corp.*, 968 F.2d at 378.

The only evidence of irreparable harm proffered by NJ PURE relates to AJG's admitted false misrepresentation of the *DiPaolo* case. On March 29, 2018, Carey sent an email to Lawrence OB/GYN stating NJ PURE had been "hit with a $4.8 million 'bad faith' verdict." (ECF No. 14-2, Ex. C.) NJ PURE alleges the false and misleading statements in the March 29 email "confused and concerned the Lawrence OB/GYN representative that he reached out to at least one other medical provider insured by NJ PURE to discuss their contents." (ECF No. 14-1 at 10.) NJ PURE further alleges Defendants disseminated the same or similar false and confusing advertising and marketing materials regarding the *DiPaolo* case to at least five other physicians or practices.

Dr. Peter DeNoble, the President of the New Jersey Doctor-Patient Alliance, contacted to NJ PURE informing it "that one or more of his members recently received communications from AJG or its representatives that called into question NJ PURE's financial strength, especially in light of the bad faith litigation and a purported $4.8 million verdict." (*Id.* at 10-11.) Further, Reconstructive Orthopedics, a NJ PURE insured, requested proof of NJ PURE's financial solvency

after an email received by Defendants. (ECF No. 18 at 4.) Dan Gopen, the Chief Operating Officer of University Spine Center also informed NJ PURE that an AJG representative asserted NJ PURE is financially insolvent. (ECF No. 14-1 at 10.) In addition, NJ PURE alleges it received a similar call of concern from Dr. Nirav Shah, the Medical Director of Princeton Brain and Spine. (*Id.* at 11.) NJ PURE alleges Dr. Shah "*believed* [the representation] was [from] an AJG representative." (*Id.* (emphasis added).) Lastly, NJ PURE alleges Dr. Mazen Itani, a vascular surgeon who was being quoted for malpractice insurance by NJ PURE, advised NJ PURE "that he needed to 'take a step back' from his application with NJ PURE because there was 'a verdict against NJ PURE last month for $4.7 million.'" (*Id.* at 12.) However, Dr. Itani "did not specify where he received this incorrect information." (*Id.*) NJ PURE merely speculates it was from Defendants. (*Id.*)

Even this third event fails to meet the standard of irreparable harm. NJ PURE merely speculates Dr. Itani and Dr. Shah received their information from Defendants, and Dr. Itani is the only prime example provided by NJ PURE as loss of goodwill. While NJ PURE has proffered evidence of reputational harm, Defendants have admitted they "mistakenly stated that the court had entered a $4.8 million verdict in the case." (ECF No. 16 at 7.) In their briefs, they further "certified" they "will take care to make that distinction clear should [they] have any future discussion about the *DiPaolo* case." (*Id.* at 7-8.)

"A case may become moot if (1) the alleged violation has ceased, and there is no reasonable expectation that it will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violations." *N.J. Tpk. Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 31 (3d Cir. 1985) (quoting *Finberg v. Sullivan*, 658 F.2d 93, 97–98 (3d Cir. 1980)); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful

behavior could not reasonably be expected to recur.'" (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968))); *Hudson v. Robinson*, 678 F.2d 462, 465 (3d Cir. 1982) ("If a defendant has discontinued challenged activities (as this defendant has), the case is moot if there is no reasonable expectation that the wrong will be repeated.").

In their briefs, Defendants promised not to make the false and misleading statements regarding the *DiPaolo* case in the future, and there is no evidence that there is any risk Defendants will make such statements, especially in light of the fact they concede the statements were inaccurate and that the *DiPaolo* case is public for anyone that needs further clarification. *Ferring*, 765 F.3d at 218 (finding that plaintiff failed to demonstrate irreparable harm where defendant "promised not to make the[] offending statements in the future," and plaintiff "adduced no evidence that there [was] any risk that any [] representative [would] make such statements, especially in light of the fact that [Defendant] ha[d] conceded that certain of the[] statements were inaccurate"). Moreover, at Oral Argument, Defendants agreed to enter into a consent order barring Defendants from distributing, dispersing, or otherwise referencing either the liability judgment or monetary judgment arising from the *DiPaolo* matter, until further order from the Court. Under these circumstances, there is no evidence demonstrating any imminent threat of irreparable and no specific activity for the Court to enjoin. Therefore, the Court finds NJ PURE has failed to meet its burden that it would suffer irreparable harm in the absence of an injunction. Accordingly, NJ PURE's Motion is **DENIED**.[1]

---

[1] The Court notes NJ PURE argues it will succeed on the merits because New Jersey law prohibits insurance brokers from engaging in Defendants behavior under N.J.S.A. § 17:9B-4(3), which forbids:

> Making, publishing, disseminating, or circulating, directly or
> indirectly, or aiding, abetting or encouraging the making,

## IV. CONCLUSION

For the reasons set forth above, NJ PURE's Motion for a Preliminary Injunction (ECF No. 14) is **DENIED.** An appropriate Order will follow.

Date: June 20, 2018          */s/ Brian R. Martinotti*
                                        **HON. BRIAN R. MARTINOTTI**
                                        **UNITED STATES DISTRICT JUDGE**

---

publishing, disseminating or circulating of any oral or written statement or any pamphlet, circular, article or literature which is false, or maliciously critical of or derogatory to the financial condition of an insurer, and which is calculated to injure any person engaged in the business of insurance.

However, there is no private cause of action under the New Jersey's Unfair Claims Settlement Practices Act, N.J.S.A. 17:29B-1 *et seq.* ("UCSPA"). *ProCentury Ins. Co. v. Harbor House Club Condo. Ass'n, Inc.*, 652 F. Supp. 2d 552, 563 (D.N.J. 2009) (dismissing the insured's complaint to the extent it could be construed to state a cause of action under the UCSPA); *Rothschild v. Foremost Ins. Co.*, 653 F. Supp. 2d 526, 537 (D.N.J. 2009) (holding there is no private right of action for violations of the UCSPA and that in passing the UCSPA, the New Jersey Legislature "was primarily concerned with addressing injuries to the public rather than providing individual citizens with another avenue of recovery against insurance providers.").